3-20-0032 in re-marriage of Katherine West-Appley and Donald West-Appellant. Good afternoon everyone. Mr. Skinner, are you ready to proceed? I am, Your Honor. I'm not seeing gallery view anymore, though I wonder if I need to hit that again. I'm only seeing you. There we go. Go ahead, whenever you're ready. Oh, you want me to start now? May it please the court. My name is Jim Skinner. I'm the attorney for the appellant, Don West, in this case. As the court knows, we filed this brief with basically four issues concerning the trial court's opinion. The first issue is the issue of maintenance. It's evident from the court's opinion that the court failed to consider Mr. West's extraordinary out-of-pocket medical expenses in the calculation of his maintenance or his gross income. The record, I think, demonstrates that Mr. West has stage four lung cancer. His financial affidavit, Exhibit 61, demonstrated that he had around $630 in monthly out-of-pocket expenses for that, and also that affidavit demonstrated that he effectively had no extra money. I mean, it was basically a wash, zero extra funds. He also presented at Exhibits 11 through 13 at 2018 expenses, which were around $792 a month, and at the final hearing, he proffered that he had some bills from University of Iowa that were over $4,000, and he had further treatment that had not yet been billed. Pursuant to, I mean, the law is clear that the maintenance statute refers back to the child support statute in the calculation of gross income, and one of the deviation factors in the child support statute is extraordinary medical expenses. In addition, the maintenance statute at 504 and 814 allows for the court to consider other factors which would be relevant for determining maintenance. In this case, the court didn't give any consideration to this factor. In fact, there's not even a mention of it in the court's opinion. It doesn't mention it in any way. It doesn't mention that he doesn't believe it. It doesn't mention that it's not applicable. It doesn't make any mention. There's no consideration, no discussion, nothing regarding this issue. It clearly is an important factor given the fact that if you add the out-of-pocket medical expenses to the maintenance, my client would be $865 a month in the red, unable to pay for his medical treatment that he needs to maintain his cancer treatments. In addition, in Dia, I cited the Dia case. That court indicated that the judges have wide latitude in consideration of factors in determining maintenance. In fact, it indicates that the court must balance the ability of the spouse to support himself with the factors that have been brought forth to the court. In this case, my client doesn't have sufficient income even to pay his own medical bills. Secondarily, in the trial court's opinion, the court, which was, I believe, pure speculation, indicated that Mr. West was going to receive Social Security benefits at some point in the future. There was no evidence before the trial court that he was going to receive Social Security benefits. There was no evidence of any of that. My client was a state employee. He worked for the prison system. He gets a pension. There was not any evidence of this. The court indicated in its opinion that part of the basis for the maintenance award was he was going to receive Social Security benefits at some point. The third issue or the third thing in the opinion that relates to his calculation of maintenance, I really didn't touch much on my brief, but he also indicated that Mr. Cola increases in his pension benefits. Again, there was no evidence of that at all. I mean, I don't have no idea if that's true or not. There was no evidence. Again, that's a minor issue, but all these things combined, I believe, support the fact that this court should reverse and remand for a reconsideration of the maintenance amount, if any, based on the court's failure, one, to consider the out-of-pocket medical expenses, which are not insignificant, and the speculation regarding the Social Security. The expenses for the medical expenses, were they from September of 2018? There was. I'm just saying that my understanding is that time he was undergoing cancer treatments and at the time that the judgment was entered, had he completed those treatments? No, he had not completed those treatments. There was no evidence he completed those treatments. He's still in treatment to this day. I think the judge kind of implied that he was healthy, and I don't know where that came from because that's not accurate. He was doing okay. I mean, that is true. He was doing okay for a while, but he still has cancer and he's still treating. Do that right now. So, I'm not sure where that came from. And those expenses, as he calculated them, do they include the AFLAC, the supplemental insurance? Well, I don't believe they did because that went to other things. I mean, that question was never asked, and I don't think it's part of the record, but those payments from AFLAC, I believe, were used for some other things, not the medical expenses. I believe that's what happened. I mean, I don't think that's in the record or no one ever asked that, but that's what I believe is the case. So, his calculation did not include the AFLAC stuff. It included what he paid. I mean, because I think if you look at the one exhibit, if I go back and look at which one it was, it was itemized. There was a check, I think what it was, and I don't remember if it had a check number or not, but it was pretty detailed in his exhibit about what he spent. That's why I think on the 792 one had more of that detail. With regard to the issue of marital and non-marital, the first thing I'd like to address is the camper. And I think the court, if you review the court's opinion letter, will see that the only thing the court said about the camper and the tractor, as far as it's being distinguished between being marital and non-marital, was that he used the same, he said, for the same reasons, I find the house to be marital, I find the tractor and the camper to be marital. Well, as the court knows from the briefs and reading the opinion, the issue regarding the house is entirely different. I mean, the house was quitclaimed, in fact, to joint tenancy during the marriage. I think the burden is entirely different and it's an entirely different argument about whether or not, you know, there was intent to gift that. The camper, it was stipulated, was only in Mr. West's name, entitled only Mr. West's name. The evidence was that the camper itself was a gift to Mr. West, as to him, from his parents. As such, I believe it's presumed to be non-marital property pursuant to the statute. No, I thought the gift was the, what he used for the trade-in, the camper there. Yes, I maybe wasn't very clear about that. Yes, you're right, Your Honor, the gift was a prior camper that he then used to trade in on the Jayco camper, which we're talking about, you are correct. I wasn't clear in my argument about that. That is accurate, but again, the statute still provides that property, property gifted to you, exchanged for property later, maintains its non-marital character. The court didn't address that issue at all. It didn't make, made no findings, no rulings, no, no cited, no evidence, no statutes or anything on the issue. Just said for the same reasons as I find the house marital, I find the camper marital. Well, I don't believe that's accurate statement of the law. You had to find either that it was one gifted to both of them, which I don't think there was that much evidence or strong evidence of that. Um, that's really the only thing they could have found, but that didn't happen. Because otherwise, if it was property, it was property exchanged for property that was gifted to him, it had to be his non-marital property. Um, and the tractor, I guess, is about the same argument. I mean, there was no doubt that Mr. West, there was no controverted evidence that Mr., in fact, Mr. West traded in his premarital Massachusetts 175 tractor for the IH884 tractor, and there was a bill of sale that was stipulated to, to him. Um, there was no dispute that that's what in fact happened. Uh, again, the court has, does not mention this issue at all, makes no findings of fact regarding it, um, doesn't cite any statutes or case law in any way about that issue. Uh, and as such, because it's presumed based on it being property obtained in exchange for non-marital property, it's presumed to be remained non-marital. Um, but the court found it to be marital without any, any findings contrary. Um, so we believe... I have a question with the trade-in on the camper and the new tractor. Um, were those paid in full or is there a debt that was paid out of marital funds? There, I, there was not evidence, I don't think of this, their only evidence on the tractor was that he believes... That's fine, if there's no evidence in the record, then, you know, don't put it there. I'm just wondering. I don't believe there is. The only thing there was, was Mr. West, I believe, testified regarding the tractor that he believed, but he wasn't sure that he put it on the home equity loan, but he wasn't sure. Okay. Okay. Thank you. All right. This is a follow-up though. I mean, it, there is, there was evidence that it was not, uh, even trade. It was, the old tractor was used to purchase as a down payment or part of a purchase, but it wasn't the entire purchase, correct? I don't believe, no, I believe that's accurate, Your Honor. It wasn't the entire purchase price. Is that the same with the camper? I am not sure about that. I don't believe there was any testimony about that, about whether there was extra money thrown in or not. I don't, I don't believe there was. I don't remember that, right now. Um, but I know with the tractor that there was extra money somewhere, but again, I, I believe the, it would be the burden if there's, if someone's seeking reimbursement, it would be their burden to prove that the marital estate should be reimbursed for any money, marital money that was used. It doesn't change the characterization of the property as non-marital. I think that then if in fact marital money was used on those two items, then it's, it's the funds. There isn't any evidence of that. So the reimbursement argument was never made. And I think that's the correct argument to be reimbursement. Not, it's not as marital, the argument would be the marital estate should be reimbursed. Well, isn't there a flip side to that argument that there was an intent to gift at the time of trade-in? To gift on the camper, you mean? And the tractor? Well, the tractor didn't have a title or anything. There's just a bill of title was only in my client's name. He never, he never put the title to the camper in the, in joint tenancy or anything like that. It only remained in his name and the bill of sale on the tractor was only to my client. So there wasn't any, anything that transferred it jointly or made it jointly held by the parties on either one of those things. Okay. Thank you. With regard to, I believe the court erred in the classification of those two items of personal property. The house argument is, is entirely different as the court knows. I believe though that the characterization of the evidence by the judge does not accurately reflect the situation. And in the court's own opinion at page A9, he says, he says the decision was made under duress of placing the house in joint tenancy. There was extensive testimony by Mr. West about what happened here, about his side of the story, you know, was that he had no intention of making a gift to the, to the estate of that house, but he felt like he was, had no choice because of his health condition and the constant complaining of his wife. It's, the case really mirrors the Binns case quite well. He testified directly at page, in 16 of my brief, I think I cite this language, but he testified directly that he did not intend to make a gift. In fact, he even said that when he, when he himself, he self-prepared that deed. He didn't go to a lawyer. He did it all himself. And when he did that deed, he thought that he was only giving it to her if he died, he didn't have intent to make it a marital asset. He said he would never have, never have transferred the property to her if she wouldn't have threatened to leave. It was indisputed that, I mean, the, how extensive her intent to leave was at the time is kind of in dispute, but my client testifies that he wakes up one morning, there's a note that says, call me. She took her dog and her clothes and had left when he was in very bad condition with cancer. It was only after this incident that he decides that he must transfer the house to her because he said, I thought I'd end up in a nursing home. I don't think that constitutes donative intent. I mean, I think his intent was to try to save himself and he did not intend to, to make a gift of that house to the marital estate. Um, and I, and I've cited to the Ben's case and I'd also cited to the Cook case, um, and in, in Cook, oop, that's the wrong one. In Cook, they talk about donated, donated, denoted donative intent. And, uh, I don't believe in this case that there is, there is, I mean, a gift is a voluntary gratuitous transfer of property, um, where the donor manifests an intent to make such a gift. My client has testified otherwise. He did not wish to make said gift. He didn't do it for over 20 years of marriage. And effectively what the trial court says is, well, 20 years is a long time to be married because they've been married a long time. It's a long time for something to remain non-marital. Well, that's not the law. That's not the law at all. I mean, it is, I mean, if something's non-marital, it could be non-marital forever. If it's non-marital, it's non-marital. Now the case is different here because he did transfer it. I mean, he did do that. Um, but I don't think that just saying the passage of time led to, um, led to that's okay. I think my time is out, Your Honor. I was just going, I was just going to say that the other thing that they, it's in the opinion that I think is pure speculation is that the wife spent her money from her non-marital house on the house when there was no evidence of that. Thank you, Mr. Skinner. Ms. Nelson. Thank you, Justices, and good afternoon. Elisa Nelson for the appellee, Catherine West herein. Justices, I would support to this court that the decisions and judgment made by the trial judge, uh, Shiplett should be upheld. Um, it is not our opinion that any of these particular, uh, decisions and judgments were made in error. As it relates to the maintenance calculation, since that's where Mr. Skinner started, I think I'll try and work, uh, down the list as well. Uh, with respect to the maintenance calculation, I believe in this particular case, it is very important to note those AFLAC payments. Regardless of what those AFLAC payments were used for, the fact that they were used to, um, balance out a $630 a month out-of-pocket medical expense. There is still some medical expense, and we're not saying that that doesn't exist. However, $200 a month in medical expenses is significantly different than $630 a month in medical expenses. Regardless of what those payments were used for, the fact is those payments do exist, and they exist to balance out. That's the purpose of those policies. Um, so whether or not, um, and again, Mr. Skinner was right. There is no evidence as to what that money went to, um, but it does balance it out. Um, the fact that there was no specific reference made to the alleged extraordinary medical expenses does not lead, one, to the fail to consider it. I think it's just a matter of it didn't rise to the level of, uh, being, you know, any other factor that the court finds particularly relevant under A14 in the maintenance statute. Um, I believe case law also suggests that, you know, each factor under the maintenance statute is not entitled to equal weight. As long as the resultant maintenance award is, uh, the award should be upheld. Uh, the judge doesn't specifically need to discuss each and every factor so long as each factor is considered by the judge. I believe we find that in the case of in remarriage of Nord, uh, and they were citing the Renard case therein. Um, so again, our position is simply that even if the court should have expressly weighed the, the medical expense, even in doing so, it would not change the ultimate result. The ultimate result is that we have a calculation that was relied upon by the court, which lists the specific gross incomes and net incomes of the parties. And those are not, there's no extra money accounted for in those as it relates to say, social security or any potential COLA increases. So while I would agree that the court did very briefly mentioned those things, I don't believe that those rise to the level of creating error here. And even so, as we stated in our brief, even if there was, it would be harmless error because again, the resultant maintenance award is reasonable and equitable here. And I believe the differences in the incomes of the parties is over $2,000 at the end of a month and the court's opinion and the record supports that there's no real debt here. Um, so again, we believe that if there were to be error, assuming that, that it would be harmless error. Um, moving on to the property, the marital versus non-marital character of that property. Uh, while again, we understand that the court did not specifically go through and list out the reasons for finding both the Jayco fifth wheel camper and the IH884 as marital. Some of the reasoning that the court utilized in the residence is absolutely applicable here in the, uh, to reverse the judgment here is, uh, to require that the opposite conclusion in this case is clearly apparent because I believe the property classification, um, is in a manifest weight of the evidence standard. The trial court made two very key comments in his opinion letter as it related specifically to, I think the characterization and impressions of credibility and reasonableness of the evidence. The trial court said that the husband wishes to portray the wife as playing the ultimate long con having realized the profit on her house. She now wished to take half of the profit from his and has bided her time over 20 years waiting for an opportune moment to pounce. The evidence simply does not support this hypothesis. The trial court is in the absolute best position to gauge the credibility of the witnesses and the testimony provided in this case. Contrary to what the appellant supports, the evidence in this case is very opposite one another at every turn. It's very much the anything you can do, I can do better version of a trial here. If husband were to say black wife would say white. And unfortunately, because of that, we have to rely very heavily on the trial court's opinion here. Um, because the trial court was the one in the position to view the credibility, observe the character and demeanor of everybody testifying at any given time. The husband would testify, I think he testified once or twice that the Jayco fifth wheel camper was received by trading in a camper that his parents gave to him. But there was also a very specific portion of the testimony where he testified, I believe on direct to his counsel, you know, did you know, that or did your nephew know you were going to down to look for another camper? Well, actually, we were just going down to visit him. We were going down to visit him. And then we had the camper that my folks gave us. So their husband says the camper my folks gave us, which is then later supported by the wife's testimony, where in she testified, she believed that the camper was a gift to both of them. The husband further goes on stating, you know, when we got there, we started looking around, we weren't really planning on buying, we just started looking around, there was a camper and we liked it. All of the wheeze in that particular statement, I think far outweigh the couple of statements that the husband does make where he says, well, my camper that I got from my parents, because when he really gets into the normal rhythm of speaking, it's very apparent that this was their property, not just his property. And I think wife's testimony supports that. So there is some opposite testimony there. As it relates to the IH 884. Again, I don't think that there is any quibble with the fact that that the trade in on that would have been a non marital tractor. However, there was some additional monies owed. And the husband's testimony was that that was probably from the equity line. During the marriage, that equity line, I think the record is pretty, pretty heavy with reference to that, that that's what the parties used to go out and buy things, both of them during the marriage. That's what they used to pay bills. That's what they used for bigger purchases. And if that was what was used to pay off the tractor, which that's the only evidence we have, unfortunately, we don't have a hard and fast proof that this is what it was. But the husband did say, probably the equity line. Even if it's not the equity line, whatever other money it is, would still have been marital money, whether it's his income, her income, or other money. So then at this point, we're caught somewhere trying to figure out what the value of the non marital portion is versus the marital portion. And again, even, even so, this is, I think, ultimately valued at $7,000 in a marital estate that's worth $350,000. So trying to, I think at that point, we're trying to split hairs because that tractor was ultimately awarded to husband. And regardless, that $7,000 is kind of but a drop in the bucket, so to speak, in the grand scheme of things. The residence, I would agree that was kind of the big one. That's, that's where the most testimony came from in this particular case. So there's a major factual dispute with this one. Husband testifies, as Mr. Skinner has said that, of course, this is, you know, he's forced, he's over a barrel, she's raking him over the cold, she's making him do this. And wife's testimony is no, that's not actually how it went down at all. You got really sick. And in fact, everybody agrees that that's a time when he was really sick, probably the sickest he was. And she started to freak out. And even husband testifies, yeah, she was worried about me not having an estate plan. By his own admission, he says, I know she was worried about that. Well, this is one of the biggest tools we have in our disposal in this particular profession for estate planning, keeping a house out of probate. The best way to do that is to put it in joint tenancy. This is the best estate planning tool we have. So that was the wife's concern. And the husband even acknowledges that. So we do tend to disagree that that was a gift made to the marital estate on purpose, or the purposes of estate planning. It wasn't forced. It wasn't because she was threatening to leave. And there's a factual dispute there too. You know, husband would have us believe that she had packed up her stuff and was leaving him. Whereas wife's testimony was just simply that she was going to go take a couple of days and stay with her dad. She took the dog because she took care of the dogs, and he was sick. She wasn't going to leave dogs in the house while he was sick. So again, we have tons of factual disputes throughout this case, but particularly as it relates to the residence. The deed here into joint names creates a rebuttable presumption of a gift to the marital estate. And that presumption can only be overcome by clear, convincing, and unmistakable evidence. We didn't get that in this case. And the trial court has been very clear about that. The trial court stated again, I think this is the second statement that the trial court made that I told the court that there would be two key statements here. This is the second one. The judge said this court has taken the opportunity to listen to the testimony of the parties and their witnesses in court. It has observed the nonverbal communication and considered their demeanor, tone, and reasonableness of their testimony in light of all collateral evidence in determining their credibility, as well as the weight to be given to their evidence. That's the second of the key things, because in making this ruling that ultimately the husband did gift this residence to the marital estate, and that it was a gift and not something that he was forced to do. The court is saying, observing all of this, this credibility determination is key here. And clearly the husband's testimony on this issue was found by the trial court to carry less credibility than that of the wife. So there was no overcoming that presumption of gift by clear convincing or unmistakable evidence. In this particular case, the trial judge did, however, account for very clear non-marital contribution to the home. That $19,888 down payment, it was very clearly non-marital. The court was well able to determine that. And in so determining, I think it can be supported that the court was weighing each and every factor as it related to whether this was marital or non-marital and accounting for the pieces and parts of things that were marital versus non-marital as it was able to. Sometimes, as with the IH-884, some of the evidence is just so convoluted. You can't separate those pieces because there's no clear evidence of it. Justices, we believe that the trial court made the appropriate judgment here, that all of the decisions rendered should be upheld, and we are asking this court to uphold those decisions. Anyone have any questions? Mr. Skinner. Yes, Your Honor. Starting with the AFLAC payments, I'm not disputing the fact that happened, but just like everything, all of the consideration of maintenance, we don't know that the judge considered any of that. He doesn't mention it. So he does not mention AFLAC, just like anything else. We are left here speculating as to what he considered. It's not like this issue of the medical expenses is a minor issue. I mean, he is treating for cancer, and the expenses were a lot. I mean, they weren't just $630,000. There's detailed exhibits and evidence. The one was $792,000 for the next year. So it was a lot of money, and here we are left, this court and the attorneys are speculating as to what the consideration was on that issue. It's not something we can just ignore. Mr. Skinner. Yes. What do you think about the credibility issue? Okay. I think if the court reads the record that it, I mean, it's hard to point to a specific thing, but if all the evidence is looked at when you read the record, and you read what the judge said, I don't think it squares with what the testimony was. I mean, I'm going to give an example. I was going to bring this up later, but in his opinion on page three, which is A10 to the appendix, the direct quote from the judge is, instead, the struggle over how to title the house was a manifestation of the slow decline in a relationship and a failure of faith in the good intentions of both parties. I think that's probably accurate. I mean, clearly the wife admits that she left him when he was very sick. She admits that everybody admits that they filed for divorce. I think it was an OA, and she tried to get him to transfer the house, and he wouldn't do it. And so I think the credibility issue is a problem, I understand, but I don't think that in reading the testimony and looking at what the judge says, in fact, he also says on page two that my client considers it was a rash decision made under duress when he placed it in joint tenancy. So he must have believed he was under duress. I don't think that the things he says in his opinion square with what the testimony was, and in fact, I think there's inconsistencies in what he says. He says one thing, and then he says another that isn't consistent with each other. So I mean, I just don't think his opinion is consistent with the evidence of what happened, and he doesn't even, I don't believe he mentions the clear and convincing evidence part of it or anything. As I said, I think this fits squarely within the facts in the Benz case. I mean, it's very, very, very similar to the same thing. I think the only thing I had left was two things. One, the camper, Jayco Camper, which was divided in this case, was titled only to Mr. West. I mean, I think that's pretty good, the best evidence of their intention is that it was titled only to him. I mean, that occurred during the marriage. So, you know, you can look at the titles or those things. It doesn't really change the fact that, you know, it was a purchase made, you know, with a trade, it was purchased during their marriage. So, I mean, that's still, I mean, the way it's titled, I don't think it is significant in terms of the fact that you still have to, when something is purchased during the marriage, you have to show though, in fact, it isn't marital property, because the presumption that it is, even no matter how it's titled. So, isn't that, I mean, you have to, you have the initial burden of showing, no, this was, you know, came from this other camper that was non-marital to begin with and keeping the nature of it, even though you bought this during a marriage. So, and what evidence is there of that? Was there a source of money that your client had to make payments on this that was in no way marital in nature? No, there was no evidence any payments were made on that camper during the marriage. The only evidence was a dispute about how the first camper that got traded for the Jayco came from my client's parents. There's no doubt about that. My client said his folks gave it to him, I think, at least once or more than once. The only reason I bring up the title that was acquired during the marriage was because if he intended to convert the non-marital camper into a marital Jayco, he would have titled it jointly. He didn't. He kept it in his name only. I just think that's evidence of his intent. And I think my light's going off again here, so I will be done. Thank you, Mr. Stainwell. Thank you. Thank you both for your arguments here today. Doesn't matter, we'll be taking under advisement and a written decision will be issued to you as soon as possible. And with that, we will take a recess until our next meeting at three o'clock. So, thank you all.